UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
                                   :
BITÚMENES ORINOCO, S.A.,           :
                                   :
     Petitioner/Cross-Respondent,  :
                                   :
                                   :    05 Civ. 9485 (LAP)
          -against-                :
                                   :
                                   :    OPINION AND ORDER
                                   :    ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
NEW BRUNSWICK POWER HOLDING         :
CORPORATION,                       :
                                   :
     Respondent/Cross-Petitioner.  :
                                   :
-----------------------------------x

LORETTA A. PRESKA, U.S.D.J.

     This dispute arises out of the alleged breach by

Petitioner/Cross-Respondent Bitúmenes Orinoco, S.A.

("BITOR"), a Venezuelan fuel supply company, of an alleged

20-year, multi-billion dollar, fuel supply agreement (the

"FSA") with Respondent/Cross-Petitioner New Brunswick Power

Holding Corporation ("NB Power"), a Canadian power company.

NB Power seeks to compel arbitration of this dispute based

on an arbitration clause within the alleged FSA.  BITOR

moves for summary judgment pursuant to Rule 56 of the

Federal Rules of Civil Procedure on the basis that no

contract (and no arbitration clause contained therein) was

ever concluded.  Specifically, BITOR contends that the

parties intended to be bound to the alleged FSA only upon

its future signing -- an event which never occurred.  For
the reasons set forth below, BITOR's motion is denied.


BACKGROUND


A.    The Parties

BITOR is a Venezuelan corporation organized under the
Commercial Code of Venezuela with its principal place of
business in Caracas, Venezuela.  (NB Power 56.1 Stmt. ¶ 1).[1]
BITOR is a wholly owned subsidiary of Petróleos de
Venezuela, S.A. ("PDVSA") through which PDVSA conducts its
Orimulsion®[2] fuel business.  (Id. ¶ 2).[3]

---

[1] "NB Power 56.1 Stmt." refers to NB Power's Local Rule
56.1(b) Statement in Response to BITOR's Local Rule 56.1(a)
Statement, dated Aug. 4, 2006.  Each paragraph reference
encompasses both the material fact submitted by BITOR and
NB Power's response thereto.  The material facts recounted
herein are undisputed, except as otherwise noted.

[2] "Orimulsion is a mixture of about 70% extra-heavy crude
oil and 30% water, which [BITOR and PDVSA] have marked as
an alternative, lower cost boiler fuel to utilities around
the world."  (NB Power's Verified Cross-Petition for an
Order Compelling Arbitration, including the Exhibits
appended thereto, dated Nov. 15, 2005 ("Cross-Pet."), ¶ 2.)

[3] For purposes of this motion, the Court need not determine
whether BITOR had or has a separate legal existence from
PDVSA (see id. ¶ 11) because, as discussed below (see infra
at 52-58), genuine issues of material fact exist as to
whether BITOR had actual or apparent authority to enter
into the alleged FSA.

PDVSA is a Venezuelan corporation organized under the
Commercial Code of Venezuela with its principal place of
business in Caracas, Venezuela.  (Id. ¶ 21).  PDVSA is
wholly owned by the Bolivarian Republic of Venezuela.  (Id.
¶ 22).  PDVSA supervises, controls, and develops
Venezuela's fuel and energy industries, including the
development and marketing of Orimulsion® fuel by BITOR.
(Id. ¶ 23) (quotations and citations omitted).  The
Government of Venezuela regulates and supervises PDVSA's
operations through the Ministry of Energy and Petroleum
("MEM") and the President of Venezuela[4] appoints the members
of PDVSA's Board of Directors.  (Id. ¶¶ 24-25 (quotations
and citations omitted)).

Bitor America Corporation ("BAC") is a wholly owned
subsidiary of BITOR.  (Id. ¶ 3).  BAC is a Delaware
corporation with its principal place of business in Boca
Raton, Florida.  (Id. ¶ 12).  BAC is BITOR's non-exclusive
marketing representative and distributor of Orimulsion®
fuel in the United States, Canada, and Puerto Rico.  (Id.
¶ 13).

NB Power is a Canadian corporation organized under the
Electric Power Act, R.S.N.B. 1973, C. E-5 and is wholly

---

[4] The President of Venezuela throughout this dispute was
Hugo Rafael Chávez Frías.

owned by the Government of New Brunswick, Canada.  (Id. ¶ 27).  NB Power generates, transmits, and distributes electricity in the Province of New Brunswick.  (Id. ¶ 28).

B.    Pre-Term Sheet Events

On December 18, 1990, NB Power and BAC signed a long-term Orimulsion® fuel supply agreement for NB Power's Dalhousie power plant.  (Id. ¶ 31).  Based in part on that transaction (see Cross-Pet. ¶¶ 39, 41), in or around July 1999, NB Power conducted engineering studies to determine the feasibility of converting its Coleson Cove power plant ("Coleson Cove") from a heavy fuel oil plant to an Orimulsion® fuel plant.  (NB Power 56.1 Stmt. ¶ 35).  At or about that time, PDVSA was supplying 50% of the heavy fuel oil for Coleson Cove.  (Id. ¶¶ 37, 71).

Since the conversion would eliminate Coleson Cove's need for heavy fuel oil and cause PDVSA to lose revenue, in April 2000 NB Power sought "confirmation from PDVSA [BITOR] that Orimulsion® supply [would] be made available for the conversion of the Coleson Cove plant."  (Id. ¶ 37 (citation omitted)).[5]  In response, on April 27, 2000, BITOR stated on combined PDVSA and BITOR letterhead that "PDVSA [BITOR]

_____

[5] "BITOR Ex." refers to the Exhibits in Support of BITOR's Motion for Summary Judgment, filed on July 22, 2006.

4

confirms that if a mutually agreeable long-term Orimulsion®
supply contract is executed by the end of the third
quarter, 2000 then the supply . . . will be made available
for Coleson Cove starting the second quarter of 2004."
(BITOR Ex. B-7 at B013532 (Letter from Luis Pacheco,
BITOR's then-Managing Director, to Stewart MacPherson, NB
Power's former President and CEO)).  BITOR further stated
that "[i]f execution of the supply contract is delayed
beyond the third quarter [of 2000], then [it] expect[s]
[that] there would be a corresponding delay in supply from
the second quarter, 2004."  (Id.).  Finally, BITOR stated
that "Orimulsion® quantities contemplated for Coleson Cove
would become subject to prior sale if contract execution is
delayed."  (Id.).

On February 7, 2001, BAC made a presentation to BITOR
regarding a potential FSA between NB Power and BITOR for
Coleson Cove.  (NB Power 56.1 Stmt. ¶ 40).  Based on that
presentation, BITOR authorized BAC to proceed with the
negotiation of a term sheet with NB Power.  (Id. ¶¶ 40-42).
After NB Power and BAC negotiated a term sheet, BAC
scheduled a signing ceremony between NB Power and BITOR in
Caracas, Venezuela for July 17, 2001.  (Id. ¶ 43).  On July
11, 2001, NB Power signed and faxed a copy of said term
sheet to BAC.  (Id. ¶ 44).  BITOR did not sign that version

of the term sheet.  (Id. ¶¶ 47-49).  Between July 14, 2001

and July 17, 2001, NB Power, BAC, and BITOR engaged in

further negotiations over the term sheet.  (Id.).  On July

17, 2001, NB Power and BITOR signed a revised term sheet

(the "Term Sheet").  (Id. ¶ 50).

The parties stated that the Term Sheet was "not

legally binding." (MacPherson Aff., Ex. 3, § 17).[6]  In

addition, the parties stated that "[b]y executing this Term

Sheet, [they] pledge to each other that they fully intend

to pursue the conversion of the [Coleson Cove] Plant to

Orimulsion and execution of the associated FSA, barring

unforeseen circumstances."  (Id.).


C.    Post-Term Sheet and Pre-FSA Signing Ceremony Events

Following the execution of the Term Sheet, the parties

undertook to convert Coleson Cove and execute an FSA.

Certain exchanges and events in this time frame are

particularly noteworthy to the issue of contract formation

and are described in detail below.

From July 2001 to October 2002, NB Power sought and

obtained the necessary regulatory approvals to convert

Coleson Cove from a heavy fuel oil plant to an Orimulsion®

---

[6] "MacPherson Aff." refers to the Affidavit of Stewart
MacPherson, NB Power's former President and CEO, and the
Exhibits appended thereto, dated Nov. 3, 2005.

fuel plant.  (NB Power 56.1 Stmt. ¶¶ 61-77, 82-89; see also
MacPherson Aff., Ex. 6 (Letter from Eduardo Hernandez, then
a BAC Vice President, to Stewart MacPherson, NB Power's
former President and CEO, dated Nov. 8, 2002: "On behalf of
all of us at [BAC], please accept our congratulations . . .
for having obtained the major permits required to convert
Coleson Cove Generation Station to Orimulsion® fuel.")).
The New Brunswick Board of Commissioners of Public
Utilities approved the conversion of Coleson Cove.  (NB
Power 56.1 Stmt. ¶ 75).  In October 2002, after submission
and review of NB Power's Environmental Impact Assessment,
the applicable New Brunswick environmental regulators
approved the conversion of Coleson Cove.  (Id. ¶¶ 88-89).
During this period, NB Power retained contractors and
engineers, conducted studies, and began preliminary
engineering work to convert Coleson Cove.  (Id. ¶¶ 90-98).
In November 2002, NB Power began the actual physical
conversion of Coleson Cove.  (Id. ¶¶ 99, 145).

From December 2001 to May 2003, the parties exchanged
seven drafts of the alleged FSA.  (Id. ¶¶ 121, 125, 134,
185, 194, 201, & 206).  On November 8, 2002, at or about
the time that NB Power commenced the actual physical
conversion of Coleson Cove, BAC wrote to NB Power that
"[BITOR], as a state owned corporation, is required by law

to complete its internal approval process prior to making supply commitments." (MacPherson Aff., Ex. 6 (Letter from Eduardo Hernandez, then a BAC Vice President, to Stewart MacPherson, NB Power's former President and CEO)). BAC's letter went on to state that "higher levels within PVDSA have the final and binding decision" for supply to Coleson Cove. (Id.).

In response, on November 13, 2002, NB Power wrote to BITOR that it is "very concerned that the progress to get these approvals indicates . . . a lack of commitment to supply Orimulsion®" to Coleson Cove and stated that NB Power "need[s] to get a commitment from [BITOR] for the fuel supply by November 22nd, 2002." (MacPherson Aff., Ex. 7 at 1, 2 (Letter from Stewart MacPherson, NB Power's former President and CEO, to Mauricio Di Girolamo, BITOR's then-Managing Director)). NB Power also apprised BITOR that "[s]ubsequent to the [regulatory] approvals, NB Power released a number of major construction contracts for the Refurbishment Project" and that "[e]xcavation work commenced on the site earlier this month to meet an in-service date during the Fall of 2004." (Id. at 1).

As a result of this exchange, NB Power and BITOR participated in a conference call on November 18, 2002. (NB Power 56.1 Stmt. ¶ 160). On December 13, 2002, BITOR

sent NB Power a follow-up letter to their call on combined
PDVSA and BITOR letterhead stating that "[w]e would like to
give our assurance that the long-term supply for Coleson
Cove is a priority for [BITOR] that will be achieved.  The
only unknown at this time is the precise timing for supply
startup."  (MacPherson Aff., Ex. 8 (Letter from Mauricio Di
Girolamo, BITOR's then-Managing Director, to Stewart
MacPherson, NB Power's former President and CEO)).

Notwithstanding NB Power's understanding of BITOR's
supply commitment, uncertainty arose yet again as a result
of political turmoil in Venezuela.  On December 2, 2002, a
national labor strike began in Venezuela, and President
Chávez declared a force majeure on Venezuelan oil products.
(NB Power 56.1 Stmt. ¶ 110).  The work stoppage crisis in
Venezuela remained until March 10, 2003.  (Id. ¶ 114).

As a result of the labor crisis, on March 6, 2003,
officials from the Canadian Embassy to Venezuela met with
representatives of BITOR and BAC to, among other things,
"support NB Power in regard to their negotiations with
PDVSA [BITOR] for a commitment to supply Orimulsion® for
their Coleson Cove refurbishment project."  (MacPherson
Aff., Ex. 1 at 1; see also NB Power 56.1 Stmt. ¶ 170).  To
prepare the Canadian Embassy for that meeting, NB Power
sent a "Briefing Note" of the "Coleson Cove Refurbishment

Project" wherein NB Power stated that it "has yet to receive the required commitment from [BITOR] of the Orimulsion® Supply beginning in the Fall 2004." (BITOR Ex. A-102 at 0239035).

Based on a summary of that meeting provided by the Canadian Embassy, on March 17, 2003, NB Power wrote to BITOR stating that it understands "that the [FSA] will need to be approved by the PDVSA Board of Directors." (BITOR Ex. A-56 at 004164 (Letter from Stewart MacPherson, NB Power's former President and CEO, to Hercilio Rivas, BITOR's then-Managing Director)).  In response, on March 21, 2003, BITOR confirmed its commitment on combined PDVSA and BITOR letterhead to "finalizing [the FSA] as soon as possible" and stated that "[o]nce discussions between NB Power and BITOR on the [FSA] are finalized, [BITOR] will present it to BITOR's Board and PDVSA['s] Board to get the final and definite approval." (NB Power Ex. 29 at B002685 (Letter from Hercilio Rivas, BITOR's then-Managing Director, to Stewart MacPherson, NB Power's former President and CEO)).[7]

---

[7] "NB Power Ex." refers to the Exhibits in support of NB Power's Opposition to BITOR's Motion for Summary Judgment, filed on Aug. 4, 2006.

On April 3, 2003, NB Power and BAC met in Boca Raton, Florida in an attempt to finalize the terms and conditions of the alleged FSA. (NB Power 56.1 Stmt. ¶ 184). Following that meeting, the parties revised the trigger date of the "Term" of the alleged FSA. (Id. ¶ 185). The "Term" provision in the drafts of the alleged FSA had run from the "date of first Delivery" which was defined as "no sooner than three (3) years and no later than five (5) years from the date of signature of this Agreement unless otherwise agreed to by the Parties." (See, e.g., NB Power Ex. 16, § 2.1 at B020839). On April 7, 2003, the parties modified the "Term" provision in the alleged FSA to run from the "date of the first Delivery" which was to be a "mutually agreed upon Day during the period September-December 2004." (NB Power Ex. 17, § 2.1 at B021445).

On April 24, 2003, BITOR sought approval from PDVSA's Executive Committee for the alleged FSA. (See NB Power Ex. 7 at B021929 (Request from Alfredo Riera, BITOR's then-President, and Hercilio Rivas, BITOR's then-Managing Director, to include an item on the PDVSA Executive Committee agenda); see also NB Power Ex. 11 at B021930 (Letter from Hercilio Rivas, BITOR's then-Managing Director, to Dr. Alí Rodríguez Araque, PDVSA's then-President, dated July 18, 2003: "As part of the approvals

11

process for contracts with terms of more than three years, in April 2003, the Executive Committee of PDVSA was given the conditions and terms of the supply contract to obtain its final approval and ask BITOR for final authorization to sign it.")).  Specifically, BITOR's then-President and BITOR's then-Managing Director co-sponsored a formal application requesting "[a]pproval for BITOR to perform a supply agreement with [NB] Power."  (NB Power Ex. 7 at B021929 (Request from Alredo Riera, BITOR's then-President, and Hercilio Rivas, BITOR's then-Managing Director, to include an item on the PDVSA Executive Committee agenda)).[8] The application attached an executive summary and presentation which, inter alia:

- summarized BITOR's relationship with NB Power (id. at B021930);

_____

[8] BITOR contends that NB Power mistranslated the word "ejecución" to mean "perform" when it actually means to "execute" or "sign."  (See Letter from E. Leo Milonas to the Court, dated Nov. 27, 2006 ("BITOR Ltr."), at 8-9).  At the outset, the Court notes that BITOR's objection is untimely as it was not raised in its reply submission when NB Power submitted the same purportedly mistranslated document as part of its opposition submission.  In any event, there are other documents which support BITOR's contrary interpretation (see, e.g., NB Power Ex. 8 at 005972 (Letter from Favio González Civaldína, PDVSA's then-Secretary, to Alfredo Riera, BITOR's then-President, dated April 25, 2003)), and this dispute does not change the outcome here.

- noted that NB Power had obtained the necessary
  governmental and environmental approvals for the
  Coleson Cove conversion (id. at B021930, B021935);

- disclosed that the conversion of Coleson Cove was
  underway and represented an investment by NB Power
  of about $500 million (id. at B021930, B021933-35);

- noted the signing of the Term Sheet by NB Power and
  BITOR (id. at B021935);

- summarized the principal terms and conditions of the
  alleged FSA (id. at B021930, B021935, & B021937);
  and

- touted the benefits of the alleged FSA (id. at
  B021938-39).

That same day, at a meeting of PDVSA's Executive

Committee, it was resolved that "the signing of the

ORIMULSION® supply agreement for a period of twenty (20)

years with [NB Power] was approved" and "the Managing

Director of BITOR, Hercilio Rivas, was authorized to sign

said agreement." (Id. at B021928). The next day, on April

25, 2003, PDVSA wrote to BITOR stating that the "Executive

Committee approved the signing of a twenty (20) year supply

contract for ORIMULSION® with the Canadian Company New

Brunswick Power (NBP)" and that "[t]he Committee also

authorized the General Manager of BITOR, Hercillo Rivas, to

sign that contract." (NB Power Ex. 8 at B005972 (Letter

from Favio González Ciavaldini, PDVSA's then-Secretary, to

Alfredo Riera, BITOR's then-President)). Shortly

thereafter, NB Power was notified that PDVSA approved the

alleged FSA and that BITOR was ready and would proceed to
sign the alleged FSA.  (See NB Power Ex. 11 at B021930
(Letter from Hercilio Rivas, BITOR's then-Managing
Director, to Dr. Alí Rodríguez Araque, PDVSA's
then-President, dated July 18, 2003: "[O]nce the approval
was obtained, [NB Power] was notified that [BITOR] was
ready to sign the contract and would proceed to sign it.");
see also NB Power Ex. 3 at 101/18-102/2 (Testimony of Dr.
Hercilio Rivas, BITOR's then-Managing Director": "Q. You
expected Mr. Hernandez [then a BAC Vice President], based
on your instruction, to inform [NB] Power that [BITOR] was
prepared to sign the agreement?  A. That [BITOR] Managing
Director had been authorized to sign the contract, the
agreement.")).

     Between April 24, 2003 and May 2, 2003, the parties
continued to negotiate the choice of law, assignment, and
release provisions in the alleged FSA.  (NB Power 56.1
Stmt. ¶¶ 199-201).  On May 2, 2003, BAC wrote to NB Power
attaching a "final" draft of the alleged FSA:

     Dave [Reid] –

     As discussed, attached is the final draft with
     the changes made as discussed by phone.

     Ron [Rostorfer]

(NB Power Ex. 35 at B021361 (E-mail from Ron Rostorfer,
then a BAC Vice President, to Dave Reid, NB Power's

then-Director of Business Planning and Senior Advisor,

Contract Development (the "May 2, 2003 E-mail"))).  The

draft of the alleged FSA attached to the May 2, 2003 E-mail

resolved the remaining open issues of the choice of law,

assignment, and release provisions.  (NB Power 56.1 Stmt.

¶ 201).

> On May 5, 2003, NB Power responded as follows:
>
> Ron [Rostorfer]:
>
> This draft looks OK to me with the following exceptions:
>
> (1) the estoppel clause – pending your lawyers review;
>
> (2) change Section 32 notice fax number for NB Power should read 506-458-4319 (the 458-4000 is a computer fax number)
>
> (3) Part B specifications Maximum Nitrogen should be 0.5 NOT 0.55
>
> Have not heard back from Government.  Will call you later this morning.
>
> Dave [Reid]

(NB Power Ex. 34 at 0238914 (E-mail from Dave Reid, NB

Power's then-Director of Business Planning and Senior

Advisor, Contract Development, to Ron Rostorfer, then a BAC

Vice President (the "May 5, 2003 E-mail"))).  The reference

to "Government" in the May 5, 2003 E-mail is the Government

of New Brunswick, which took an interest in the precise

wording of the assignment clause and intimated that NB

Power would be required to get its approval -- as opposed
to just the approval of NB Power's Board of Directors -- if
the language could not be agreed upon to its satisfaction.
(NB Power 56.1 Stmt. ¶ 200; see also BITOR Ex. A-74 at
005975 (E-mail from William H. Teed, Q.C., then-Counsel for
the Government of New Brunswick, to David Reid, NB Power's
then-Director of Business Planning and Senior Advisor,
Contract Development)).  Ultimately, BITOR agreed to
modified language in the assignment clause in the alleged
FSA attached to the May 2, 2003 E-mail that was
satisfactory to the Government later that day on May 5,
2003.  (NB Power 56.1 Stmt. ¶ 202; see also BITOR Ex. A-75
at 005978 (E-mail from William H. Teed, Q.C.,
then-Counsel for the Government of New Brunswick, to David
Reid, NB Power's then-Director of Business Planning and
Senior Advisor, Contract Development)).

On May 6, 2003, NB Power's former President sought and
obtained approval from NB Power's Board of Directors to
enter into the alleged FSA.  (NB Power 56.1 Stmt. ¶¶ 101-
02, 203).  NB Power communicated the occurrence of this
event to BITOR via BAC.  (NB Power Ex. 10, at B000548 (BAC
Monthly Report, January-May 2003: "NB Power's Board of
Directors approved the contract in a special meeting on May
6th."); see also NB Power Ex. 46 at B012814 (Notes of Ron

16

Rostorfer, then a BAC Vice President, dated May 6, 2003:

"Bd has approved K!")).

On May 6, 2003, BAC wrote to NB Power attaching the

final draft of the alleged FSA and a draft press release:

Dave [Reid] –

As discussed, attached are the two subject
documents.

We would like your approval regarding the Press
Release so that it can be issued as stated on
Thursday.  It would be translated into Spanish
for Venezuelan distribution.  The version from
BAC would go to the U.S. and trade press, but not
to Canada unless you approve.

Confirming the travel details in Caracas, Eduardo
[Hernandez] will meet your flight from Atlanta,
Delta 907, arriving Caracas at 8:43 pm Wednesday.
You are all staying at the Eurobuilding Hotel.
The phone number there is 011-58-212-902-1111.
The fax number is 011-58-212-993-9285.
Hopefully, your corporate secretary will fax her
signature page to you [no later than] Thursday
morning at 8:30 am Eastern Time.  The signing
ceremony is tentatively set for about 10 am
Thursday, followed by lunch.  There will be a
dinner in the evening.  Eduardo will also handle
your departure for the airport on Friday morning.

We expect you will take the signed copies of the
contract home with you for follow-up signature by
your corporate secretary.  You could then express
mail the BITOR and BAC copies to our office.

Regards,

Ron [Rostorfer]

(MacPherson Aff., Ex. 10 (E-mail from Ron Rostorfer, then a

BAC Vice President, to Dave Reid, NB Power's

17

then-Director of Business Planning and Senior Advisor,
Contract Development, copy to Eduardo Hernandez, then a BAC
Vice President (the "May 6, 2003 E-mail")); see also NB
Power 56.1 Stmt. ¶ 206).  The draft press release, post-
dated May 8, 2003, attached to the May 6, 2003 E-mail,
stated that "[BITOR] announced today that it has signed a
new long-term ORIMULSION® fuel supply agreement with
Canada's [NB Power]."  (NB Power 56.1 Stmt. ¶ 207).

The alleged FSA attached to the May 6, 2003 E-mail
contained, inter alia, the following terms and conditions:

- a "take or pay" clause obligating NB Power to pay
  BITOR for each shipment of Orimulsion® fuel even if
  Coleson Cove was not converted by that time to burn
  Orimulsion® fuel properly upon delivery (MacPherson
  Aff., Ex. 10, §§ 1.1 & 3);

- an express obligation by NB Power to convert Coleson
  Cove to burn Orimulsion® fuel properly in compliance
  with World Bank guidelines (id. § 23.1 ("Buyer
  expressly agrees to construct and operate Emission
  Control Equipment ([i.e., flue gas desulfurization,
  electrostatic precipitator nitrogen oxide reduction
  and/or other emission control systems and equipment
  to be retrofitted to the Plant in order for Buyer to
  meet the requirements of applicable Laws and
  Regulations pertaining to ORIMULSION® use at the
  Plant] when using ORIMULSION® at the Plant."));

- a "cooperation and good faith" clause (id. § 23.6
  ("The Parties understand the importance of the
  permitting process . . . to the conversion of the
  Plant to Orimulsion®.  Consequently, the Parties
  agree to closely cooperate and interface on all
  project decisions affecting permitting issues; and
  to closely cooperate, coordinate and reach a
  consensus on all government, public policy, press
  releases and outreach programs.  This is due not

18

only to the importance of [this] matter[] to the overall success of the conversion project and hence, this agreement, but also to the ORIMULSION® trade name.”));

- a no oral modification clause (id. § 28.1 (“This Agreement may be amended only by a document in writing signed by the duly authorized representatives of each Party; . . .”));

- a merger clause (id. § 29.1 (“This Agreement constitutes the entire agreement and understanding of the Parties with respect to the subject matter hereof, and neither of the Parties has entered into this Agreement in reliance upon any representation, warranty or undertaking by or on behalf of the other Party that is not expressly set out herein.”));

- a counterparts clause (id. § 30 (“This Agreement may be executed in any number of counterparts by original or facsimile signatures, and these counterparty and facsimile signed agreements shall have the same effect as if the signatures on the counterparts were original and on a single copy of this Agreement.”));

- an arbitration clause (id. § 34(a) (“Any dispute, controversy or claim relating to this [FSA] or the breach thereof shall be settled by arbitration . . . in accordance with the commercial arbitration rules of the American Arbitration Association.”));

- a waiver of sovereign immunity clause (id. § 35.5 (“As to all disputes, controversies or claims between the Parties arising out of or relating to this Agreement, both Parties unconditionally and irrevocably agree that the execution, delivery and performance of this Agreement constitute private and commercial acts rather than public or governmental acts.”)); and

- a New York governing law clause (id. § 36 (“This Agreement and any arbitration . . . shall be construed and conducted according to and governed by the Uniform Commercial Code and the other laws of the State of New York, U.S.A.”)).

After representatives of NB Power flew down to Caracas, Venezuela, the signing ceremony for May 8, 2003 was cancelled.  (NB Power Ex. 10 at B000549 (BAC Monthly Report, January-May 2003: "However, on arriving in Caracas, [NB Power was] advised that even though the PDVSA approval has been obtained, the contract could still not be signed.")).  The MEM told PDVSA to delay the signing of the alleged FSA pending its review and, thus, PDVSA instructed BITOR not to sign the alleged FSA.  (NB Power 56.1 Stmt. ¶¶ 207, 211; see also NB Power Ex. 11 at B021930 (Letter from Hercilio Rivas, BITOR's then-Managing Director, to Dr. Alí Rodríguez Araque, PDVSA's then-President, dated July 18, 2003: "[O]ne day before the date scheduled for the signing, an instruction was received from . . . PDVSA indicating that the contract would not be signed.")).

Representatives of the Canadian Embassy, NB Power, BAC and BITOR then met at the Canadian Embassy in Caracas, Venezuela to discuss the cancelled signing ceremony.  (NB Power 56.1 Stmt. ¶ 210).  NB Power was advised that MEM now needed to approve the alleged FSA.  (NB Power 56.1 Stmt. ¶ 209; NB Power Ex. 10 at B000549 (BAC Monthly Report, January-May 2003: "The Canadian diplomats were advised the issue was a new approval step being required from the [MEM], and that this process would not take too long."); NB

20

Power Ex. 11 at B021930 (Letter from Hercilio Rivas,
BITOR's then-Managing Director, to Dr. Alí Rodríguez
Araque, PDVSA's then-President, dated July 18, 2003: "[W]e
were informed that the contract had to be backed by the
[MEM], because there was a new regulation that was required
for the signing of long-term contracts; there had been no
prior knowledge of that regulation.")).

D.    Post-FSA Signing Ceremony and Pre-Arbitration Events

Following the cancelled signing ceremony, the parties
continued to work together, with the assistance of
diplomatic officials, to execute the alleged FSA.  During
this period, NB Power continued the refurbishment of
Coleson Cove.  (NB Power 56.1 Stmt. ¶¶ 53, 217-18).

On July 17, 2003, NB Power wrote to the Venezuelan
Embassy seeking "assistance in finalizing a long term
contract for the supply of Orimulsion® from Venezuela for
NB Power's Coleson Cove Generating Station."  (BITOR Ex.
A-89 at 006104 (Letter from Stewart MacPherson, NB Power's
former President and CEO, to Jorge E. Osorio Garcia,
then-Venezuela's Ambassador to Canada)).  NB Power's letter
went on to state that "[t]he contract has been approved by
both [BITOR] and [PDVSA], however, cannot be signed until
it has been reviewed by [the MEM] and that the MEM's

21

"review has been ongoing for over two months and there has not been any indication of when the review will be completed." (Id.). On September 4, 2003, NB Power wrote to BITOR stating that it has "already invested substantial capital in th[e] conversion" of Coleson Cove and that it "must obtain the signed Coleson Cove Agreement at the earliest possible date." (BITOR Ex. A-91 at 006169 (Letter from Stewart MacPherson, NB Power's former President and CEO, to Dr. Hercilio Rivas, BITOR's then-Managing Director)).

On September 15, 2003, NB Power wrote again, but this time to the MEM, stating that "NB Power considers that a valid contract has completed and that the [FSA] must be executed." (BITOR Ex. A-92 at 004235 (Letter from Stewart MacPherson, NB Power's former President and CEO, to Rafael Ramírez, then-Minister of the MEM)). NB Power further requested the MEM to "authorize BITOR to sign the [FSA] that has been negotiated in good faith by both BITOR and NB Power consistent with the [Term Sheet] of July 2001." (Id.).

On September 19, 2003, the MEM responded to the Canadian Embassy and "ask[ed] that [it] transmit the message to [its] Government and the companies involved, that the Government of the Republic of Venezuela will honor

22

all supply contracts for Orimulsión and all supply
commitments undertaken by our company PDVSA." (BITOR Ex.
A-94 at 006209 (Letter from Rafael Ramírez, then-Minister
of the MEM, to Allam Culham, then-Canada's Ambassador to
Venezuela)). Upon receipt of this information from the
Canadian Embassy, NB Power wrote to the MEM on September
26, 2003 and stated that "NB Power is reassured by the
commitment of the Venezuelan Government to supply
Orimulsion® to the Coleson Cove Project," that "NB Power is
available to meet . . . to conclude the contract in a
timely manner," and that NB Power "look[s] forward to
having the contract signed by the end of October . . . ."
(BITOR Ex. A-95 at 004244-45 (Letter from Stewart
MacPherson, NB Power's former President and CEO, to Rafael
Ramírez, then-Minister of the MEM)).

On October 16, 2003, officials from the Canadian
Embassy met with officials from the MEM regarding the
alleged FSA. (NB Power 56.1 Stmt. ¶ 230). After that
meeting, the Canadian Embassy reported to NB Power that
"prior to arranging a contract signing, MEM plants to send
several engineers to assess conversion plans and
requirements of Canada (NB Power) . . . by early November."
(BITOR Ex. A-97 at 004248 (E-mail from Daniela Oyague, a
then-Canadian Embassy official, to among others, David

Reid, NB Power's then-Director of Business Planning and Senior Advisor, Contract Development)).

On December 17, 2003, following the visit by the MEM's engineers to Coleson Cove and prior to entering into a shipping contract for the transportation of Orimulsion® fuel from Jose, Venezuela to New Brunswick, Canada, NB Power wrote again to the MEM seeking its "assistance in expediting the signing of the negotiated" alleged FSA and stating that "[NB Power] would hope that with [the MEM's] internal review completed we can officially execute the contract."  (BITOR Ex. A-98 at 004256-57 (Letter from Stewart MacPherson, NB Power's former President and CEO, to Rafael Ramírez, then-Minister of the MEM)).  On January 19, 2004, NB Power wrote to PDVSA stating that NB Power would appreciate PDVSA's "assistance in expediting the signing of the negotiated and approved contract between NB Power and BITOR to ensure that the shipping arrangements are consistent with the Orimulsion® supply contract" and asked for "a schedule to officially execute" the alleged FSA. (BITOR Ex. A-99 at 004267-68 (Letter from Stewart MacPherson, NB Power's former President and CEO, to Dr. Alí Rodríguez Araque, PDVSA's then-President)).

Finally, on February 13, 2004, NB Power wrote PDVSA threatening the commencement of litigation if the alleged

FSA was not executed by February 20, 2004. (BITOR Ex. A-100 at 006888-89 (Letter from Stewart MacPherson, NB Power's former President and CEO, to Dr. Alí Rodríguez Araque, PDVSA's then-President)). NB Power stated, in pertinent part, as follows:

> . . . NB Power and BITOR completed an Orimulsion®
> [FSA] that was approved by the PDVSA Executive
> Committee in April 2003. Although the FSA has
> not been officially executed, we have continued
> to get reassurance from the [MEM] and PDVSA
> staff, who visited New Brunswick in November
> 2003, that the commitment to supply Orimulsion®
> to Coleson Cove will be honoured. Based on these
> reassurances and advice that the FSA is binding
> on [BITOR], PDVSA and NB Power as at [sic] May 7,
> 2003, NB Power has continued to make significant
> investments to meet its obligation to begin using
> Orimulsion® in the Fall of 2004.
>
> NB Power regrets to inform you that it regards
> the failure of [BITOR] to execute the FSA in
> Caracas on May 7th, 2003 or since that date as a
> repudiation of the FSA and therefore considers
> that [BITOR] has breached the FSA.
>
> . . .
>
> . . . NB Power believes that it has exhausted all
> its other options for obtaining [BITOR's] and
> PDVSA's formal commitment to the FSA.

(Id.).


E.    NB Power's Demand for Arbitration and BITOR's and
      PDVSA's Lawsuits to Enjoin the Arbitration Proceeding

      Pursuant to the arbitration clause in the alleged FSA

(see supra at 19), on or about September 1, 2005, NB Power

filed a Notice of Arbitration and Statement of Claim

against BITOR and PDVSA with the American Arbitration
Association in New York, entitled New Brunswick Power
Holding Corp. v. Bitúmenes Orinoco, S.A., and Petróleos de
Venezuela, S.A., 50 198 T 00354 05. (See Cross-Pet.,
Ex. I).  In response, on October 19, 2005, BITOR and PDVSA
filed separate Verified Petitions in the Supreme Court of
the State of New York, County of New York, entitled
Petróleos de Venezuela, S.A. v. New Brunswick Power Holding
Corp., Index No. 114594/2005 (N.Y. Sup. Ct., N.Y. Cty.) and
Bitúmenes Orinoco, S.A. v.  New Brunswick Power Holding
Corp., Index No. 114595/2005 (N.Y. Sup. Ct., N.Y. Cty.),
respectively.  (See Cross-Pet., Exs. B-C).  These actions
sought, inter alia, a permanent injunction against NB Power
from proceeding with the above arbitration proceeding.
(See Cross-Pet., Ex. C at ¶ 1(a)).

On November 9, 2005, NB Power removed BITOR's and
PDVSA's Verified Petitions to this Court pursuant to
9 U.S.C § 205.  (See Notice of Removal at 1).[9]  That
provision permits removal from state courts when the
subject matter of the case relates to an arbitration
agreement under the Convention on the Recognition and
Enforcement of Foreign Arbitral Awards ("CREFAA").  See

---

[9] "Notice of Removal" means the Notice of Removal, including
the Exhibits appended thereto, filed on Nov. 9, 2005.

CREFAA, opened for signature June 10, 1958, 21 U.S.T. 2517,

330 U.N.T.S. 3 (entered into force by the United States,

Dec. 29, 1970) (ratified and incorporated in 9 U.S.C.

§§ 201 et seq.).


DISCUSSION[10]

_____

[10] Article II of the CREFAA requires an "agreement in writing." Kahn Lucas Lancaster, Inc. v. Larke Int'l, Ltd., 186 F.3d 210, 216 (2d Cir. 1999) (quoting CREFAA art. II, § 2). This requirement is defined to "include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters of telegrams." Id. Now that discovery is complete on the issue of contract formation, BITOR contends that this case must be dismissed for lack of subject matter jurisdiction because the CREFAA's writing requirement is not satisfied. (See Corrected Memorandum of Law in Support of BITOR's Motion for Summary Judgment, dated July 24, 2006 ("BITOR Mem."), at 43-44; Reply Memorandum of Law in Support of BITOR's Motion for Summary Judgment, dated Aug. 11, 2006 ("BITOR Reply Mem."), at 10 n.19; BITOR Ltr. at 1-3). In rejecting such a challenge in a recent CREFAA case, the Court of Appeals held that "the federal courts have subject matter jurisdiction under 28 U.S.C. § 1331, unless the federal claim is immaterial, frivolous and insubstantial or made solely for the purpose of obtaining jurisdiction." Sarhank Group v. Oracle Corp., 404 F.3d 657, 660 (2d Cir. 2005). Nowhere does BITOR assert that NB Power's claim is "immaterial, frivolous and insubstantial or made solely for the purpose of obtaining jurisdiction." To the contrary, BITOR's "argument [i.e., that BITOR did not enter into an arbitration agreement with NB Power] depends entirely upon its view of the merits of the case [i.e., that BITOR did not enter into the alleged FSA with NB Power], and therefore does not involve a lack of subject matter jurisdiction . . . ." Id. NB Power claims subject matter jurisdiction under the CREFAA pursuant to the arbitration clause contained in the following exchange of correspondence: (i) the May 2, 2003 E-mail sent to NB Power
                                        (continued)

A.    <u>Summary Judgment Standard</u>

"Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue

---

(continued)
which contained the "final" draft of the alleged FSA with the arbitration clause at issue; (ii) the May 5, 2003 E-mail sent by NB Power stating that the May 2, 2003 draft of the alleged FSA was "OK"; and (iii) the May 6, 2003 E-mail sent to NB Power attaching the execution version of the alleged FSA with the arbitration clause at issue.  This exchange easily satisfies the legal standard articulated by the Court of Appeals in <u>Sarhank Group</u>.  In addition, this exchange easily distinguishes this case from the primary case relied upon by BITOR, <u>Dynamo v. Ovechkin</u>, 412 F. Supp. 2d 24, 28 (D.D.C. 2006), where there was no evidence that the party to be bound "expressed his affirmative acceptance of an agreement to arbitrate."  <u>Id.</u> at 28-29 (finding the evidence relied upon by the party seeking to compel arbitration, including that party's unilateral offer for a new contract that the party to be bound never responded to or even acknowledged, "persuasively support[ed] the argument that [the party to be bound] wished to end his relationship with [the party seeking to compel arbitration] once and for all").  Thus, NB Power has adequately invoked the CREFAA for purposes of subject matter jurisdiction.

for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

256 (1986) (citing Fed. R. Civ. P. 56(e)). "Factual

disputes that are irrelevant or unnecessary" cannot defeat

a motion for summary judgment. Id. at 248.

"In determining whether a genuine issue of material

fact exists, a court must examine the evidence in the light

most favorable to the non-movant, in this case [NB Power]."

Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 253 (2d

Cir. 2002 (citing Matsushita Elec. Indus. Co. v. Zenith

Radio Corp., 475 U.S. 574, 587 (1986)). Only if it is

apparent that no rational fact-finder "could find in favor

of the nonmoving party because the evidence to support its

case is so slight" should summary judgment be granted.

Gallo v. Prudential Residential Servs., Ltd. P'ship, 22

F.3d 1219, 1224 (2d Cir. 1994).

B.   Contract Formation Standard

The legal standard for contract formation under New

York law[11] is well established:

> Under New York law, if parties do not intend to
> be bound by an agreement until it is in writing
> and signed, then there is no contract until that
> event occurs. Scheck v. Francis, 26 N.Y.2d 466,
> 311 N.Y.S.2d 841, 843, 260 N.E.2d 493, 494
> (1970). This rule holds even if the parties have
> orally agreed upon all the terms of the proposed

---

[11] The parties do not dispute that the issue of contract
formation is governed by New York law.

contract. <u>Schwartz v. Greenberg</u>, 304 N.Y. 250, 107 N.E.2d 65 (1952). On the other hand, where there is no understanding that an agreement should not be binding until reduced to writing and formally executed, and "[w]here all the substantial terms of a contract have been agreed on, and there is nothing left for future settlement," then an informal agreement can be binding even though the parties contemplate memorializing their contract in a formal document. <u>Municipal Consultants & Publishers, Inc. v. Town of Ramapo</u>, 47 N.Y.2d 144, 417 N.Y.S.2d 218, 220, 390 N.E.2d 1143, 1145 (1979); <u>V'Soske v. Barwick</u>, 404 F.2d 495, 499 (2d Cir. 1968), <u>cert. denied</u>, 394 U.S. 921, 89 S. Ct. 1197, 22 L.Ed.2d 454 (1969).

<u>R.G. Group, Inc. v. Horn & Hardart Co.</u>, 751 F.2d 69, 74 (2d Cir. 1984).

The key contract formation issue here is whether NB Power and BITOR intended to be bound absent a memorialized writing -- i.e., a signed, dated, and delivered FSA. "What matters are the parties' expressed intentions, the words and deeds [of the parties] which constitute objective signs in a given set of circumstances." <u>Id.</u> "Subjective evidence of intent . . . is generally not considered." <u>Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.</u>, 145 F.3d 543, 549 (2d Cir. 1998).

"Whether a contracting party intends not to be bound in the absence of a writing is a question of fact to be presented for resolution to the factfinder at trial." <u>Consarc Corp. v. Marine Midland Bank, N.A.</u>, 996 F.2d 568,

576 (2d Cir. 1993); see also Int'l Minerals & Res., S.A. v.
Pappas, 96 F.3d 586, 593 (2d Cir. 1996) ("[T]he issue of
whether and when the parties intended to be bound is a
factual issue that should [be] submitted to the jury.").
The Court of Appeals has "previously held summary judgment
an improper procedural vehicle for determining the parties'
intent not to be bound in the absence of written
agreements–even in cases where evidence strongly suggests
the contrary." Consarc, 996 F.2d at 576 (emphasis added).
"While [the intentions of the parties are] frequently a
source of persistent disputes of fact, '[w]here a question
of intention is determinable by written agreements, the
question is one of law, appropriately decided on a motion
for summary judgment." Brown v. Cara, 420 F.3d 148, 153
(2d Cir. 2005) (quoting Arcadian Phosphates, Inc. v.
Arcadian Corp., 884 F.2d 69, 73 (2d Cir. 1989)).

    The parties agree that the alleged FSA was not
executed. At the summary judgment stage, this Court must
determine whether the only conclusion a reasonable
fact-finder could draw is that the parties intended to be
bound only by a signed FSA. The factors which guide this
analysis are well-settled: "(1) whether there has been an
express reservation of the right not to be bound in the
absence of a writing; (2) whether there has been partial

31

performance of the [alleged] contract; (3) whether all of
the terms of the alleged contract have been agreed upon;
and (4) whether the alleged agreement at issue is the type
of contract that is usually committed to writing." <u>Winston</u>
<u>v. Mediafare Entm't Corp.</u>, 777 F.2d 78, 80 (2d Cir. 1980).
"These circumstances may be shown by 'oral testimony or by
correspondence or other preliminary or partially complete
writings.'" <u>Id.</u> at 81 (quoting Restatement (Second) of
Contracts § 27 cmt. c (1981)).

Given the above legal standards for summary judgment
and contract formation, BITOR can only prevail on this
motion if the record evidence demonstrates "uncontroverted
objective signs evincing an intent not to be bound" absent
a signed, dated, and delivered FSA. <u>Consarc</u>, 996 F.2d at
576.


1.   <u>Express Reservation of the Right Not to Be Bound</u>
The first prong of the <u>Winston</u> analysis turns on
whether BITOR explicitly stated to NB Power that it
reserved the right to be bound only when the FSA was
signed.  This factor favors NB Power.

BITOR contends that NB Power cannot demonstrate mutual
consent to be bound by the alleged FSA on May 6, 2003.
(<u>See</u> BITOR Mem. at 13-23).  BITOR relies on evidence which

it claims demonstrates its intent to be bound to the alleged FSA only upon its signing.

According to BITOR, the parties' prior contracting experiences rendered any contrary expectation by NB Power unreasonable. (See BITOR Reply 56.1 Stmt. at 2).[12]  The 1990 Dalhousie Fuel Supply Agreement was signed between NB Power and BAC. (See supra at 4). And the Term Sheet was signed on July 17, 2001, only after further changes were made by BITOR because did not sign the version executed by NB Power on July 11, 2001. (See supra at 5-6).

BITOR also relies upon several key documents which reference that the alleged FSA needed to be "executed" or "signed" to be binding. BITOR's April 27, 2000 letter advised NB Power that its commitment to supply Orimulsion® fuel was dependent on "execution" of the alleged FSA. (See supra at 4-5). The Term Sheet stated that the parties "fully intend to pursue . . . execution of the associated FSA, barring unforeseen circumstances." (See supra at 6). On April 25, 2003, PDVSA authorized BITOR, to "sign" the alleged FSA on BITOR's behalf and authorized BITOR's Managing Director to "sign" the alleged FSA on BITOR's behalf. (See supra at 13). The May 6, 2003 E-mail

---

[12] "BITOR Reply 56.1 Stmt." means BITOR's Reply Statement of Undisputed Material Facts in Support of its Summary Judgment Motion filed Aug. 11, 2006.

established a date and time for a "signing ceremony" and described the process for NB Power to sign and deliver the alleged FSA. (See supra at 17). The draft press release attached to the May 6, 2003 E-mail, post-dated May 8, 2003, stated that "[BITOR] announced today that it has signed a new long-term Orimulsion® fuel supply agreement with Canada's [NB Power]." (See supra at 18).

BITOR further contends that certain terms and conditions of the alleged FSA attached to the May 6, 2003 E-mail show that the parties intended to be bound only upon execution. The alleged FSA contained blank signature lines, a blank effective date linked to signature, a merger clause, a no oral modification clause, a counterparts clause, and a waiver of sovereign immunity clause upon "execution" clause. (MacPherson Aff., Ex. 10 at 5, 53-54; see supra at 19). The alleged FSA also provided for New York law as the governing law and, thereby, incorporated by reference New York's Statute of Frauds provisions requiring (unless any exceptions apply) certain contracts to be memorialized in a signed writing in order to be enforceable. (See supra at 19).[13]

---

[13] BITOR cites this clause based on its reliance on Walpex Trading Co. v. Yacimientos Petroliferos Fiscales Bolivianos, 789 F. Supp. 1268, 1278 (S.D.N.Y. 1992).
(continued)

BITOR also asserts that NB Power's conduct after May 6, 2003 undermines NB Power's contention that the alleged FSA was binding as of that date.  NB Power's President traveled to Caracas, Venezuela on May 7, 2003 to sign and deliver the alleged FSA on May 8, 2003, in accordance with the process for execution set forth in the May 6, 2003 E-mail.  (See supra at 17).  The only "commitment" that NB Power disclosed in its 2003 Annual Report for the fiscal

---

(continued)
(See BITOR Mem. at 31).  This reliance is misplaced because the governing law at issue in Walpex was Bolivian law, not New York law.  The district court found that Bolivian law required execution to form a valid contract.  Walpex, 789 F. Supp. at 1278 ("[T]hese controlling [Bolivian] authorities require execution of a notarized, witnessed contract recorded as a public deed to form a valid contract with an instrumentality of the Bolivian government, with the absence thereof voiding the contract.").  New York law is not akin to Bolivian law on this point.  As discussed herein, under a traditional contract formation analysis, "where there is no understanding that an agreement should not be binding until reduced to writing and formally executed, and '[w]here all the substantial terms of a contract have been agreed on, and there is nothing left for future settlement,' then an informal agreement can be binding even though the parties contemplate memorializing their contract in a formal document." R.G. Group, 751 F.2d at 74 (citation omitted).  Moreover, even if the Statute of Frauds applied to render a contract unenforceable because it was not memorialized in a signed writing, the well-recognized equitable doctrine of promissory estoppel, if applicable, can bar a party from asserting that defense. See, e.g., Esquire Radio Elecs. v. Montgomery Ward & Co., 804 F.2d 787, 793-95 (2d Cir. 1987)).  Thus, the parties' incorporation of a New York governing law clause in the alleged FSA does not lead to the conclusion that "the only inference" that can be drawn is that [BITOR] did not intend to be bound in the absence of an executed contract. Walpex, 789 F. Supp. at 1278.

year ending on March 31, 2003, finalized on May 12, 2003
and released to the public by August 2003, was the Term
Sheet, not the alleged FSA.  (See NB Power 56.1 Stmt.
¶ 212).  NB power spent the next eight months, from June
2003 to January 2004, seeking BITOR's signing of the
alleged FSA. (See supra at 21-25).  Finally, the first time
that NB Power asserted that the alleged FSA was a binding
agreement was on September 15, 2003.  (See supra at 22).

   NB Power concedes that the "various references to
signing and execution may be 'some' evidence of the
parties' intent."  NB Power Opp'n Mem. at 5.[14]
"[C]onsiderable weight is put on a party's explicit
statement that it reserves the right to be bound only when
a written agreement is signed."  R.G. Group, 751 F.2d at
75.  In addition, courts have interpreted "blank signature
lines with an open agreement date" to "reflect[] a mutual
intent on the part of both parties not to be bound to the
terms of the agreement until the agreement was executed."
Spencer Trask Software and Info. Serv. LLC v. RPost Int'l
Ltd., 383 F. Supp. 2d 428, 442 (S.D.N.Y. 2003) (citations
omitted).  Also, "[t]he presence of . . . a merger clause

---

[14] "NB Power Opp'n Mem." refers to NB Power's Memorandum of
Law in Opposition to BITOR's Motion for Summary Judgment
dated Aug. 4, 2006.

is persuasive evidence that the parties did not intend to be bound prior to execution of a written agreement." Ciaramella v. Reader's Digest Assoc. Inc., 131 F.3d 320, 324 (2d Cir. 1997). The same is true for a no oral modification clause. See R.G. Group, 751 F.2d at 76. In sum, there are facts from which a reasonable fact-finder could conclude that the parties intended to be bound to the alleged FSA only upon its signing. However, these are not the only facts in the record.

NB Power relies upon the wealth of testimony it has adduced from people directly involved in negotiating the alleged FSA to support its position that a reasonable fact- finder could conclude that the parties did not intend to condition the alleged FSA on formal execution. BITOR and BAC executives testified that they never disclosed any formal signature requirement to NB Power and that no such agreement to condition formation of the alleged FSA upon signing was ever reached. (See NB Power Ex. 3 at 74/16-75/6 (Testimony of Hercilio Rivas, BITOR's then-Managing Director: "Q. Did you ever have any discussion with anybody at [NB] Power in which you stated that the [FSA] would only become binding upon signature? . . . A. Never. Never. Q. Did you ever reach agreement on behalf of [BITOR] with NB Power that the [FSA] would only be binding upon

signature? . . . A. Never."); NB Power Ex. 4 at 259/3-21
(Testimony of Ron Rostorfer, then a BAC Vice President:
"Q. . . . My question is whether you picked up the phone
and called them and advised them not to, or to stop
construction until there was a signed [FSA]?  A. No. . . .
A. No.  Q. Is the answer no?  A. I don't think we did, no.
I'm sure we did not. Q. Did you or Mr. Hernandez [then a
BAC Vice President] call anybody at NB Power at that time
and say look guys until there is a signed fuel agreement we
don't have a deal? . . . A. I don't think that was
said.")).  NB Power executives testified similarly that
there was never any discussion, let alone an agreement,
that the alleged FSA would be binding only upon signing.
(See MacPherson Aff. ¶ 32 ("There was never any suggestion,
either in the telephone conference of November 18, 2002
[with BITOR's then-Managing Director, Mauricio Di Girolamo,
among other people], or the confirmatory letter of comfort
on December 13, 2002 [sent by Mr. Di Girolamo], that
BITOR's commitment to supply Orimulsion to Coleson Cove
depended upon a formal physical signing of the FSA."); Reid
Aff. ¶ 3 ("[T]he question of whether [a] signature would be

necessary to make the FSA binding was not a subject of [the parties'] negotiations.")).[15]

Moreover, NB Power relies upon key events and contemporaneous documents which corroborate the above testimony that BITOR never expressly (or implicitly) communicated to NB Power that it reserved its right to be bound until the FSA was signed.  At a critical juncture in the parties' negotiations in the fall/winter of 2002, when NB Power was about to break ground on the multi-million dollar conversion of Coleson Cove, BITOR specifically assured NB Power that "the long-term supply for Coleson Cove is a priority for [BITOR] that will be achieved" and stated that "[t]he only unknown at this time is the precise timing for supply startup." (See supra at 8-9 (emphasis added)).  During the course of their negotiations, when the parties focused on a question related to contract execution, the parties severed the link between future performance and signing.  (See supra at 11; see also NB Power Ex. 5 at 146/16-147/4 (Testimony of Edurardo Hernandez-Carstens, then a BAC Vice President: Q. . . . [D]o you know why [Section 2.1 of the alleged FSA] was changed to eliminate any reference to signature?  A. I

---

[15] "Reid Aff." refers to the Affidavit of David Reid, NB Power's then-Director of Business Planning and Senior Advisor for Contract Development, dated Nov. 3, 2005.

believe the NB Power negotiators wanted a 20-year actual
supply that would go from the first delivery because of the
uncertainty in the dates that we had to deliver the first
cargo.  And they wanted to adjust for 20-year effective
supply from Day 1 and not tie it to the -- to the
signature.  And I think that's why the change.")).
Moreover, a BAC internal document stated that the alleged
FSA was finalized on May 2, 2003 and conspicuously failed
to mention any formal execution requirement as a
prerequisite to a binding contract.  (See NB Power Ex. 10,
at 2 (BAC Monthly Report, January-May 2003: "As a result of
. . . meetings and several follow-up teleconferences, the
contract was finalized on May 2nd.")).  Finally, the May 6,
2003 E-mail attaching the alleged FSA could be construed by
a reasonable fact-finder to constitute a fait accompli
since it contained no conditional language whatsoever.
(See supra at 17).

In sum, the record evidence precludes the finding that
the only conclusion a reasonable fact-finder could reach is
that BITOR explicitly stated to NB Power that it reserved
its right to be bound only when the FSA was signed.

2.    Partial Performance

The second prong of the Winston analysis turns on whether NB Power partially performed under the alleged FSA and whether that performance was accepted by BITOR.  See Spencer Trask Software, 383 F. Supp. 2d at 444 ("Partial performance requires some actual performance of the contract, such that the plaintiffs must have conferred something of value upon the defendants which the defendants accepted.") (citation omitted).  This factor favors NB Power.

It is undisputed that BAC participated in regulatory hearings before the New Brunswick Public Utility Board to aid NB Power in obtaining the necessary approvals to commence the Coleson Cove conversion.  (See, e.g., NB Power Ex. 4 at 139/18–140/2 (Testimony of Ron Rostorfer, then a BAC Vice President: "Q. And did you understand that one of the reasons why [Nelson] Garcia [then a BAC employee] was cooperating in the fall of 2001 on permitting issues with NB Power related to environmental approvals was because of the lead time required to get the plant ready to burn Orimulsion by the Fall of 2004?  A. Sure.")).  Moreover, it is uncontroverted that BITOR was fully aware that, as of the fall/winter of 2002, as a result of having obtained the necessary regulatory approvals, NB Power commenced the

41

conversion of Coleson Cove.  (See, e.g., NB Power Ex. 11 at
B021930 (Letter from Hercilio Rivas, BITOR's then-Managing
Director, to Dr. Alí Rodríguez Araque, PDVSA's
then-President, dated July 18, 2003: "[I]n November 2002
[NB Power] started the work for conversion of the plant due
to the urgency on the part of [NB Power] to have the plant
available and be able to meet its electricity supply
commitments."); see also NB Power Ex. 28 at B000103 (2002
BAC Annual Report: "Construction work commenced at [Coleson
Cove] on November 1st, and continued throughout the balance
of the year.")).  Finally, it is undisputed that BITOR was
aware that NB Power spent hundreds of millions of dollars
refurbishing Coleson Cove.  (See, e.g., BITOR Reply 56.1
Stmt. at 3 (conceding that "NB Power . . . budgeted '$403
million in the Coleson Cove refurbishment,' and . . .
expended and committed to expend hundreds of millions of
dollars to refurbish Coleson Cove – including signing the
major $280 million construction contract on December 11,
2002.'") (citations omitted)).

    BITOR concedes that the Coleson Cove refurbishment was
undertaken by NB Power "to prepare for, or in anticipation
of, a binding agreement with [BITOR]."  (BITOR Mem. at 26).
Notwithstanding this substantial undertaking, BITOR
contends that NB Power's partial performance is irrelevant

because said performance was referable to the Term Sheet, not the alleged FSA.  (<u>Id.</u> at 25-27).  Although the alleged FSA became binding as early as May 6, 2003 under NB Power's theory, a reasonable fact-finder could conclude that the parties' partial performance before May 6, 2003 reflected the commercial and regulatory realities of negotiating a long-term energy supply contract.  From the outset, it was understood by the parties that they would need to begin performing cooperation and retrofitting obligations well in advance of a final FSA.  (<u>See, e.g.</u>, NB Power Ex. 5 at 95/2-10 (Testimony of Edurado Hernandez, then a BAC Vice President: "Q. Was that your understanding, that the lead time, so to speak, in order to get the plant ready to burn Orimulsion by the Fall of 2004 was about two years? A. Yes.  Q. And you had understood that really since the beginning of your discussions about Coleson Cove.  Correct? A. Yes.").  Accordingly, every draft of the alleged FSA, including the initial version sent to NB Power in December 2001, contained an express obligation by NB Power to convert Coleson Cove to burn Orimulsion® fuel properly and a "cooperation and good faith" clause.  (<u>See</u> <u>supra</u> at 18-19; <u>see also</u> BITOR Ex. B-15, §§ 23.1 & 23.6 at B020423-24 (12-17-01 Draft FSA); BITOR Ex. B-16, §§ 23.1 & 23.6 at B010845-47 (3-02 Draft FSA); BITOR Ex. B-19, §§ 23.1 & 23.6

at B011502-04 (9-12-02 Draft FSA); BITOR Ex. A-65, §§ 23.1,
23.6 at 031955, 031957 (4-7-03 Draft FSA); BITOR Ex. A-72,
§§ 23.1 & 23.6 at 140971-73 (4-23-03 Draft FSA); BITOR Ex.
B-27, §§ 23.1 & 23.6 at B012363 (5-2-03 Draft FSA)).  This
performance was critical to NB Power because every draft of
the alleged FSA, including the initial version sent to NB
Power in December 2001, had a "take or pay" obligation.
(See supra at 18; see also BITOR Ex. B-15, §§ 1.1 & 3 at
B020388, B020390-92 (12-17-01 Draft FSA); BITOR Ex. B-16,
§§ 1.1 & 3 at B010810, B010812-14 (3-02 Draft FSA); BITOR
Ex. B-19, §§ 1.1 & 3 at B011469, B011471-73 (9-12-02 Draft
FSA); BITOR Ex. A-65, §§ 1.1 & 3 at 031921, 031923-25
(4-7-03 Draft FSA); BITOR Ex. A-72, §§ 1.1 & 3 at 140935,
140937-39 (4-23-03 Draft FSA); BITOR Ex. B-27, §§ 1.1 & 3
at B012372, B012374-76 (5-2-03 Draft FSA)).

    Assuming arguendo that NB Power's performance prior to
May 6, 2003 was not cognizable because it was not
unequivocally referable to the alleged FSA, a reasonable
fact-finder could conclude that NB Power's continued
performance after May 6, 2003 was referable to the alleged
FSA and indicated that the parties intended to be bound
absent a formally executed FSA.  All correspondence sent by
NB Power after May 6, 2003 referenced and discussed in
various degrees of detail the ongoing conversion of Coleson

44

Cove to burn Orimulsion® fuel properly.  (See, e.g., BITOR
Ex. A-98 at 004256 (Letter from Stewart MacPherson, NB
Power's former President and CEO, to Rafael Ramírez,
then-Minister of the MEM, dated December 17, 2003: "We are
writing to update you on the Coleson Cove project.  We
continue to project our completion of the Project for first
delivery of Orimulsion® in Fall 2004.  We have attached
some photos from the Coleson Cove Project site which will
illustrate our progress."); BITOR Ex. A-100 at 004265-67
(Letter from Stewart MacPherson, NB Power's former
President and CEO, to Dr. Alí Rodríguez Araque, PDVSA's
then-President, dated January 19, 2004: stating that the
construction projects to convert Coleson Cove were ongoing
from November 2002 to that time, itemizing the various
contracts and their respective stages of completion, and
detailing NB Power's financial outlay of $747 million
Canadian dollars)).  Moreover, BITOR's internal documents
confirm that it was well aware that NB Power continued to
expend resources to convert Coleson Cove after May 6, 2003.
(See NB Power Ex. 51 at B021931 (Letter from Hercilio
Rivas, BITOR's then-Managing Director, to Dr. Alí Rodríguez
Araque, PDVSA's then-President, dated July 18, 2003:  "We
know that [NB Power] has continued with the conversion work
. . . .")).  Finally, in its reply submission BITOR

conceded that NB Power continued to convert Coleson Cove
after May 6, 2003.  (See BITOR Reply 56.1 Stmt. at 8
(stating that "NB Power continued its Coleson Cove
refurbishment/conversion without a signed FSA" after May 6,
2003)).

3.  Agreement on All Terms

The third prong of the Winston analysis turns on
whether all the terms and conditions of the alleged FSA
were finalized so that the only remaining act to be done
was for BITOR and NB Power to sign the alleged FSA.  This
factor favors NB Power.

Based on the record evidence, a reasonable fact-finder
could conclude that, as of May 2, 2003, and certainly by
May 6, 2003, all of the terms and conditions in the alleged
FSA were finalized.  BITOR and BAC executives testified
that this was the case.  (See, e.g., NB Power Ex. 3 at
105/4-10 (Testimony of Hercilio Rivas, BITOR's
then-Managing Director: "Q. Just so we're clear, as far as
you knew and believed on May 6, 2003, all of the terms and
conditions of the [FSA] had been finalized?  A. The
information that I had was that both parties, [BAC] and NB
Power, had agreed as to everything."); NB Power Ex. 5 at
55/1-4 (Testimony of Edurado Hernandez, then a BAC Vice

President: "Q. Was it your understanding as of May 6, 2003, again that the wording of this contract had been agreed? A. Yes."); see also id. at 53/5-13 ("Q. . . . Was any of the wording of this May 2nd, 2003, final draft contract in dispute? A. No. Q. So is it fair to say that at this stage, May 2nd, 2003, from your perspective the wording of the [FSA] for Coleson Cove had been finalized. A. Yes.")). A contemporaneous BAC document corroborates the parties' testimony. (See NB Power Ex. 10, at 2 (BAC Monthly Report, January-May 2003: "As a result of . . . meetings and several follow-up teleconferences, the contract was finalized on May 2nd.")).

Given this uncontrovertable evidence, BITOR effectively conceded the point. (See BITOR Mem. at 43 (stating that "the negotiators finished negotiating"); BITOR Reply Mem. at 2 (stating that although the parties agreed on every term in the alleged FSA "[t]here [was] no evidence of . . . overall agreement" to create a binding obligation)).[16]

---

[16] BITOR contends that the parties did not agree on all the terms and conditions in the alleged FSA because BITOR's former President, Alfredo Riera, disputes NB Power's interpretation of the liquidated damages term. (See Declaration of Alfredo Riera, dated July 20, 2006, ¶ 19). Even accepting this self-serving testimony (which is contradicted by the contemporaneous evidence on this point (continued)

4.    <u>Type of Contract Usually Committed to Writing</u>

The fourth prong of the <u>Winston</u> analysis turns on whether the alleged FSA is the type of complex business transaction that would normally be memorialized in a signed writing.  This factor favors BITOR.

A 20-year, multi-billion dollar, energy contract between two government-regulated entities from different countries is the type of complex business transaction that is usually memorialized in a signed writing.  NB Power makes no argument to the contrary and, thus, concedes the point. (<u>See</u> NB Power Opp'n Mem. at 4-5 ("NB power has acknowledged from the outset[] that the parties contemplated reducing their agreement to a signed writing.")).

5.    <u>Conclusion on Contract Formation</u>

Considering all the objective facts and circumstances and drawing all reasonable inferences in favor of NB Power, a reasonable fact-finder could conclude that BITOR did not make "uncontroverted objective signs evincing an intent not

---

(continued)
and was submitted more than three years after the parties
exchanged the alleged FSA and after litigation commenced),
a disputed issue of fact would remain as to the third prong
of the <u>Winston</u> analysis.

to be bound" absent a signed, dated, and delivered FSA. Consarc, 996 F.2d at 576.  In other words, a reasonable fact-finder could conclude that the signing ceremony in Caracas, Venezuela on May 8, 2003 constituted nothing more than a purely ministerial act.  A reasonable fact-finder could also conclude that NB Power's conduct after May 6, 2003 reflected the mindset and behavior of business people trying to resolve a dispute informally with a supposed 20-year partner who had previously been cooperating with NB Power to achieve a strategic business objective, rather than lawyers racing to the courthouse steps resulting in the likely end of a long-term business relationship.

     This case is similar to the New York Court of Appeals' decision in Municipal Consultants & Publishers, Inc. v. Town of Ramapo, 47 N.Y.2d 144 (1979).  There, the Court of Appeals held that a contract was binding on the Town of Ramapo –– despite the lack of a signature –– where (i) all terms had been agreed upon; (ii) the Town Board approved the contract and authorized the Town supervisor to sign it on the Town's behalf; and (iii) the Town's attorney notified the other party that the Town's Board approved the contract and forwarded the final version of the contract for execution.  47 N.Y.2d at 148-49.  Because the Town clearly intended to be bound, the Court of Appeals found

that execution of the contract had become only a

"ministerial" act.  Id.[17]

Here, as in Municipal, it is undisputed that (i) the

terms and conditions of the alleged FSA were finalized by,

May 2, 2003, or, at the latest, May 6, 2003; (ii) on April

24, 2003, after receiving an executive summary and

presentation of the material terms and conditions on the

alleged FSA, PDVSA approved the signing of the alleged FSA

and authorized BITOR's then-Managing Director to sign the

alleged FSA on BITOR's behalf; and (iii) NB Power was

thereafter notified that PDVSA approved the signing of the

alleged FSA and, on May 6, 2003, NB Power was sent the

final version of the alleged FSA for execution.  Moreover,

although not even present in Municipal, here, the parties

had a substantial pre-contract relationship involving

cooperation to obtain regulatory approvals and a multi-

_____

[17] See also Church of God of Prospect Plaza v. Fourth Church
of Christ, Scientist, of Brooklyn, 76 A.D.2d 712, 714-15
(App. Div. 2d Dept. 1980) (determining that a contract
existed although no document was signed where "[n]either
the minutes of the defendant's corporate meeting at which
plaintiff's offer was accepted nor the transmittal letter
[to plaintiff enclosing the contract to be executed]
expressly or impliedly reserved the effectiveness of the
agreement until the formal contract was signed"), aff'd on
other grounds, 54 N.Y.2d 742, 745 (1981).

million dollar construction project to retrofit Coleson

Cove to burn Orimulsion® fuel properly.[18]

    In sum, three of the four prongs of the <u>Winston</u>

analysis cut against BITOR.[19]

---

[18] The combination of circumstances here including, <u>inter alia</u>, that a reasonable fact-finder could conclude that the parties reached agreement on all terms in the alleged FSA and satisfied the applicable corporate authorizations, distinguishes this case from the authorities relied upon by BITOR. (<u>See, e.g.</u>, BITOR Mem. at 16-18 (citing <u>Longo v. Shore & Reich, Ltd.</u>, 25 F.3d 94, 96-97 (2d Cir. 1994), <u>Scheck v. Francis</u>, 26 N.Y.2d 466, 469-70 (1970), and <u>Schwartz v. Greenberg</u>, 304 N.Y. 250, 253-54 (1952)). Moreover, BITOR's citation to the Court of Appeals' decision in <u>Arcadian Phosphates</u>, 884 F.2d at 70, for the proposition that courts will not "overlook . . . clear expressions of intent simply because the parties gave assurances, satisfied preconditions or received 'approvals' required to enter into an agreement" is misplaced. (BITOR Mem. at 34). The agreement at issue in <u>Arcadian Phosphates</u> was no more than a preliminary agreement, like the Term Sheet in the instant case, to negotiate a contract. Thus, the Court of Appeals affirmed the dismissal of the breach of contract claim in <u>Arcadian Phosphates</u> because it held that the party seeking enforcement of that preliminary agreement should have known it was not binding. <u>Id.</u> at 72 ("The language of the November memorandum – two references to the possibility that negotiations might fail and the reference to a binding sales agreement to be completed at some future date – shows that [the party seeking to avoid enforcement of the memorandum] did not intend to be bound."). NB Power does not seek enforcement of the Term Sheet here; it seeks enforcement of the alleged FSA.

[19] Even if only two prongs of the <u>Winston</u> analysis favored NB Power, this Court would still deny BITOR's motion given the Court of Appeals' admonition against deciding the issue of intent as a matter of law "even in cases where evidence strongly suggests" that the parties did not intend to be bound absent a signed written contract. <u>Consarc</u>, 996 F.2d at 576.

C.    Actual or Apparent Authority

Even if a reasonable fact-finder could conclude that a contract was formed on May 6, 2003, BITOR contends that the alleged FSA could not be binding as a matter of law because it did not have actual or apparent authority to enter into the alleged FSA. (See BITOR Mem. at 20-21; BITOR Reply Mem. at 4-5). Specifically, BITOR contends that its Board of Directors did not approve the alleged FSA. (See BITOR Mem. at 21). According to BITOR, this corporate formality was a condition precedent to formation of the alleged FSA purportedly required by its By-Laws and communicated to NB Power. Such a finding is precluded, however, by the record on summary judgment because issues of authority raise further factual disputes to resolve at trial.

At the outset, whether compliance with this corporate formality was even required by BITOR is a disputed issue of fact. A reasonable fact-finder could conclude from the record evidence that PDVSA authorization was the only corporate formality required for BITOR to enter into the alleged FSA. (See, e.g., NB Power Ex. 3 at 106/9-18 (Testimony of Hercilio Rivas, BITOR's then-Managing Director: "Q. . . . [D]id you believe as of [May 6, 2003] that whatever approvals were required on [BITOR's] side had

been obtained by [BITOR]?  A. From PDVSA, I did think so
because the authorization had come from its highest
authority which was the Executive Committee.  Q. As of May
6, 2003, did you know of any other approvals that you . . .
were required to get before signing the [FSA]?  A. No.");
NB Power Ex. 4 at 191/22-192/5 (Testimony of Ronald
Rostorfer, then a BAC Vice President: "Q. Did anybody ever
tell you on or after May 6, 2003, that the [B]oard of BITOR
still needed to approve the [FSA]?  A. No.  Q. When is the
first time you heard that?  A. Just now."); NB Power Ex. 6
at 35/6-19 (Testimony of Aires Barreto, PDVSA's
then-Vice President: Q: . . . "[D]oes this refresh your
recollection that with respect to contracts of sale of
crude and products for periods greater than three years,
the maximum authority of affiliates was to submit to a
higher level for the higher level's approval?
A. Basically, what it says is anything above three years
has to come to PDVSA.  Q. Okay.  So the affiliate itself
didn't have the authority to approve such a contract.
A. No.  Q. Its role was to submit it to PDVSA for PDVSA's
consideration?  A. Yes.  Q. And that's consistent you're
your recollection of the role of [PDVSA's] Executive
Committee and affiliates as of the time you were a director

[of PDVSA]?  A. Yes.")).[20]  Moreover, a reasonable fact-

finder could conclude that PDVSA authorization was the only

corporate formality NB Power was led to believe that BITOR

needed to obtain -- and did in fact obtain -- to enter into

the alleged FSA.  (See, e.g., NB Power Ex. 11 at B021930

(Letter from Hercilio Rivas, BITOR's then-Managing

Director, to Dr. Alí Rodríguez Araque, PDVSA's-then

President, dated July 18, 2003: "[O]nce the approval [from

PDVSA] was obtained, NB Power was notified that it [BITOR]

---

[20] BITOR attempts to demonstrate as a matter of law that the
approval of its Board of Directors was required to enter
into the alleged FSA by submitting a declaration from its
former Managing Director to that effect.  (See Declaration
of Hercilio Rivas, dated July 21, 2006, ¶ 7 ("I understand
that, based on the May 2, 2006 expert report of Rafael
Badell [Madrid], [BITOR's expert on Venezuelan law],
[BITOR] lacked authority to enter into the alleged FSA.
Accordingly, although I testified during my deposition
that, in early May 2003, I believed that [BITOR] had
obtained the necessary approvals to enter into an FSA for
Coleson Cove, I now understand that I was wrong.  The PDVSA
Executive Committee merely authorized [BITOR] to sign an
FSA for Coleson Cove, and did not negate the requirement
that [BITOR's] board of directors had to approve such an
agreement.") (emphasis added)).  However, as the declarant
himself admits, this assertion contradicts his prior
deposition testimony on this point.  Cf. Hayes v. New York
City Dep't of Corrs., 84 F.3d 614, 619 (2d Cir. 1996) ("[A]
party may not create an issue of fact by submitting an
affidavit in opposition to a summary judgment motion that,
by omission or addition, contradicts the affiant's previous
deposition testimony.") (citing Perma Research & Dev. Co.
v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969)).
Accordingly, this issue of authority raises a genuine issue
of material fact.

was ready to sign the contract and would proceed to sign it."); NB Power Ex. 12 at B013707 (BITOR Summary of Alleged FSA dated post-December 18, 2003: "Once the approval was obtained [for the alleged FSA from PDVSA, NB Power] was notified that we were ready to sign the agreement and that we would proceed to do so.")).

Assuming _arguendo_ that BITOR's Board of Directors was required to approve the alleged FSA, there is ample evidence in the record for a reasonable fact-finder to conclude that the Board gave its _de_ _facto_ approval.[21]  For

---

[21] BITOR contends that the issue of whether its Board of Directors gave its _de_ _facto_ approval is irrelevant as a matter of law because Venezuelan law does not recognize the doctrine of apparent authority. (_See_ BITOR Mem. at 20-21; BITOR Reply Mem. at 4).  In support of its assertion, BITOR submitted an expert declaration to this effect as part of its reply papers. (_See_ Declaration of Dr. Rafael Badell Madrid, dated Aug. 8, 2006 ("Madrid Reply Decl."), ¶ 4). "The court in determining foreign law may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1.  Rule 44.1 grants the district court wide latitude in resolving issues of foreign law and the court's determination shall be treated as a ruling on a question of law.  _See_ _Rutgerswerke_ _AG & Frendo S.p.A. v. Abex Corp._, No. 93-2914, 2002 WL 1203836, at *16 (S.D.N.Y. June 4, 2002).  The Court of Appeals has "urge[d] district courts to invoke the flexible provisions of Rule 44.1 to determine issues relating to the law of foreign nations." _Curley v. AMR Corp._, 153 F.3d 5, 13 (2d Cir. 1998).  Pursuant to Rule 44.1, the Court rejects BITOR's expert testimony on the issue of apparent authority.  At his deposition, Dr. Madrid conceded that he is not an expert on this topic. (_See_ NB Power Ex. 2 at 133/20-134/8 ("Q. Well, under general Venezuelan contract
(continued)

instance, BITOR's then-Managing Director, who was also one of two Directors on BITOR's Board in the spring of 2003, testified that he was overwhelmingly in favor of entering into the alleged FSA on May 6, 2003.  (See, e.g., NB Power Ex. 3 at 104-4/12 (Testimony of Hercilio Rivas: "Q. Did you view the news that [NB] Power executives would come as good news when you first heard it? . . . A. Yes.  Q. Why. A. Because at that time I wanted to sign the contract."); id. at 102/4-8 ("Q. And were you . . . at this point that is, having received the approval from PDVSA's Executive Committee, were you agreeable to signing the [FSA] for

---

(continued)

or agency law, may a party who lacks actual authority to bind a principal to a contract nevertheless bind that principal to a contract where the principal has led the counterparty to believe that the party in fact has authority to bind the principal? . . . A. I am not familiar with Venezuelan law on the agencies insofar as contracts. I think it does not exist, but I would have to study that." (emphasis added)); see also id. 131/15-132-9).  Moreover, Dr. Madrid contradicted his reply declaration by stating at his deposition that Venezuelan law does, in fact, recognize the doctrine of apparent authority.  (Compare id. 137/17-138/21 ("Q. Do you agree with that statement [i.e., that a person who, by his own fault, creates an erroneous appearance, is responsible for the damages that may be caused to third parties; the most adequate redress consists of giving legal value to appearance] as a general principle of Venezuelan law?  A. As a general principle, as he states, yes, in general terms."), with Madrid Reply Decl. ¶ 4 ("The doctrine of '[a]pparent authority' is not recognized by Venezuelan Law, nor is it applicable to the contractual activities of public corporations.")).  Accordingly, BITOR cannot demonstrate as a matter of law that its Board of Directors could not have given de facto approval of the alleged FSA under Venezuelan law.

Coleson Cove?  A. I was in agreement.")).  BITOR's then-
President, who was the other Director on BITOR's Board in
the spring of 2003, was the co-sponsor of BITOR's
presentation to PDVSA's Executive Committee seeking
approval of the alleged FSA.  (See supra at 11-13).  In
addition, a reasonable fact-finder could conclude from the
contemporaneous evidence that BITOR's President failed to
object to the alleged FSA because, in fact, he supported
entering into the contract.  (See NB Power Ex. 3 at 65/12-
66/3 (Testimony of Hercilio Rivas, BITOR's then-Managing
Director: "Q. After May 8, 2003, did [BITOR's then-
]President Riera ever tell you that he had been opposed to
the Coleson Cove [FSA]?  No, because if he had said that to
me, and he as my superior, I would not have sent that to
the [B]oard.  Q. The PDVSA [B]oard?  A. PDVSA [B]oard.
Q. Just so the record is clear, from the time that you
became Managing Director in January 2003 until the time you
proposed that the PDVSA [B]oard approve the Coleson Cove
contract, did President Riera ever express any opposition
to the contract?  A. Never."); see also id. at 122/2-10
("Q. . . . [D]id [BITOR's then-]President Riera contact you
to oppose the [FSA] for Coleson Cove?  A. Mr. Riera has
never been opposed to the [FSA], at least he has never told

me that.")).[22]   Accordingly, BITOR's authority argument does

not warrant the conclusion that the alleged FSA could not

be binding as a matter of law.[23]

--------

[22] BITOR attempts to refute this evidence as a matter of law
by pointing out that the signature of its former President
fails to appear next to his name on the presentation to
PDVSA's Executive Committee (whereas the signature of its
former Managing Director appears next to his name) and that
its former President did not know that PDVSA approved the
alleged FSA.  (See BITOR Reply 56.1 Stmt. at 7).  Given the
record evidence on the issue of de facto approval by
BITOR's Board of Directors, it is not reasonable to
conclude that the only inference to be drawn from this one
document is that BITOR's former President did not support
the contract.

[23] BITOR makes the additional argument that BAC did not have
authority to enter into the alleged FSA on BITOR's behalf.
(See BITOR Mem. at 22-23; BITOR Reply Mem. at 4-5).  This
argument is misplaced because NB Power contends that BITOR
itself entered into the alleged FSA (see NB Power Opp'n Mem.
at 16 n.18) and, thus, the Court declines to address it.

## CONCLUSION

For the reasons set out above, BITOR's motion for summary judgment (dkt. no. 25) is denied. Counsel shall confer and inform the Court in writing by February 7, 2007 how they propose to proceed. Letters shall not exceed five pages.

SO ORDERED:

DATED:     New York, New York
           January 31, 2007

*Loretta A Preska*

LORETTA A. PRESKA, U.S.D.J.